**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

| | |
|---|---|
| IN RE: ) | |
| ) | Chapter 11 |
| ) | |
| TRINITY GUARDION, INC., ) | Hon. Andrea K. McCord |
| ) | |
| Debtor. ) | Case No. 22-90227-AKM-11 |
| ) | |

## MOTION FOR RELIEF FROM STAY AND TO LIQUIDATE CLAIM

Jean-Ann Downey, as Trustee of the Jean Ann Downey Trust dated 8/15/1990 ("Mrs. Downey"), hereby moves pursuant to Section 362(d)(1) of the Bankruptcy Code for relief from the automatic stay solely for the purpose of liquidating Mrs. Downey's claim against the Debtor in the longstanding litigation pending in DuPage County, Illinois captioned Case No. 2016 L 000054 (the "State Court Action").  If this Court grants this Motion, Mrs. Downey will take no action to enforce any judgment rendered in the State Court Action, but will merely assert her then-liquidated claim in this Chapter 11 case.

The Debtor filed for bankruptcy on the eve of a hearing where the judge in the State Court Action, after more than *six years* of litigation, was expected to adjudicate the Debtor's liability for over $3.6 million in loans (inclusive of interest).  Mrs. Downey, the 93-year old mother of one of the Debtor's principals, holds by far the largest unsecured claim in this case. Requiring Mrs. Downey to re-litigate her claims anew in this bankruptcy proceeding would be costly, inefficient, and enormously prejudicial.  Good cause exists to grant Mrs. Downey relief from the automatic stay to enable the judge in the State Court Action to liquidate Mrs. Downey's claim against the Debtor prior to the development of a plan of reorganization.  Any proceedings to enforce a judgment entered against the Debtor in the State Court Action would be stayed pending further order of this Court. In support of her motion, Mrs. Downey states as follows:

**FACTUAL BACKGROUND**

1. Between 2009 and 2012, Mrs. Downey and her late husband, Bernard ("Bernie"), made a series of loans to help two of their adult children, Joe Downey and Mary Ellen Rippe (along with Mary Ellen's husband, Bruce Rippe), start a business.

2. The business that Joe, Mary Ellen and Bruce co-founded was called Downey & Rippe LLC ("Downey & Rippe").

3. Downey & Rippe initially sold furniture and lighting. Later, Downey & Rippe developed and filed provisional patents for a mattress cover to be used by hospitals and nursing homes to protect against infection.

4. In December 2010, Joe, Mary Ellen, and Bruce formed what would eventually become the Debtor, Trinity Guardion, LLC ("Trinity Guardion" or the "Debtor"). Downey & Rippe assigned to the Debtor all of Downey & Rippe's intellectual property and inventory regarding the mattress cover. The Debtor paid nothing for the transfer.

5. After Downey & Rippe spun off its mattress cover business to the Debtor, Downey & Rippe's remaining product lines dried up. Today, Downey & Rippe conducts no business and is essentially moribund.

6. The money that Mr. and Mrs. Downey lent to Downey & Rippe was used to fund the Debtor's operations and expansion. All told, Mr. and Mrs. Downey loaned nearly $1.8 million to Downey & Rippe between 2009 and 2012. After application of the agreed-upon 8% rate of interest, the balance owed on the loans currently totals over $3.6 million.[1]

---

[1] The Debtor misstated its liability to Mrs. Downey as $1,927,715.88 in its "List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders." (*See* Dkt. 1, pg. 5 of 10.)

2

7. The loans were payable on demand. Most were documented through a series of loan acknowledgements letters dictated by Bernie and signed by Mary Ellen.

8. Following Bernie's death in 2012, Mrs. Downey assigned the loans to her trust, the Jean Ann Downey Trust dated 8/15/1990.

9. On behalf of her trust, Mrs. Downey demanded that Downey & Rippe and the Debtor repay the outstanding balance of the loans. They refused.

## PROCEDURAL HISTORY

10. In 2016, Mrs. Downey commenced the State Court Action seeking to recover the balance due on the loans. Mrs. Downey asserted claims for breach of contract against Downey & Rippe and, in each count, also alleged that the Debtor was Downey & Rippe's alter ego and was jointly and severally liable for the indebtedness.

11. The case proceeded to trial. A jury was tasked with deciding the legal claims against Downey & Rippe and the Hon. Robert Rohm (the "State Court Judge") was responsible for deciding the equitable claims against the Debtor.

12. The jury ruled in favor of Downey & Rippe, finding that repayment of the loans was conditioned on Downey & Rippe earning a profit or being sold and, because those conditions precedent were never satisfied, the liability had not matured and the loans were not yet due and owning.

13. The State Court Judge dismissed the claim against the Debtor, concluding that the issue of the Debtor's alter-ego liability was moot in light of the jury's verdict.

14. Following the trial, Mrs. Downey sought and obtained leave to file an amended complaint for a declaratory judgment that Downey & Rippe and the Debtor are alter egos. Despite noting that "there has not been a more deserving plaintiff" seeking declaratory relief than

Mrs. Downey, that she "deserves an answer" regarding the Debtor's liability, and that "equity screams" for a ruling one way or the other, the trial court reasoned that it lacked subject matter jurisdiction in light of the jury's verdict and dismissed the claim.

15. Mrs. Downey appealed. On September 2, 2021, the Appellate Court reversed the decisions of the trial court, holding that (1) the jury's verdict in favor of Downey & Rippe was against the manifest weight of the evidence because the loans at issue were demand notes and were not conditioned on Downey & Rippe making a profit or being sold, and (2) the State Court Judge "was [not] bound by the jury's verdict" and could have found against the Debtor's regardless of the jury verdict in favor of Downey & Rippe. *Downey v. Downey + Rippe,* LLC, 2021 IL App (2d) 200572-U (copy attached as Exhibit A).

16. On the latter point, the Appellate Court concluded that the "jury's finding that [Downey & Rippe] had not breached the contract did not in any way prohibit the trial court from ruling on the alter ego issue" and, even if the Court had not reversed the jury's verdict in favor of Downey & Rippe, it was error to conclude that "the jury's verdict controlled the claims that [the trial court] was to adjudicate" against the Debtor. (*See* Ex. A, ¶¶ 30-31.)

17. The legal underpinnings of the Appellate Court's ruling in favor of Mrs. Downey derives from the Appellate Court's previous decision in *Werderman v. Liberty Ventures, LLC*, 368 Ill. App. 3d 78 (2d Dist. 2006), a copy of which is attached as Exhibit B.

18. *Werderman* holds that when a single trial includes multiple claims, with some claims tried to a jury and others decided by the court, the trial judge is not bound by the jury's determinations. *Id.* at 90-91. The two fact-finders are independent, and the judge is free to render a decision that is inconsistent with the jury's verdict. *Id.*

19. Faithful to the principle enunciated in *Werderman*, the Appellate Court recognized that, as an independent fact-finder, the State Court Judge was free to determine that the Debtor was liable for repayment of the loans, even if that ruling was inconsistent with the jury's (now reversed) verdict in favor of Downey & Rippe. In short, the Appellate Court reasoned that the jury's verdict was not binding on the State Court Judge in any way and the State Court Judge could separately and independently adjudicate the equitable alter ego claims against the Debtor.

20. The Illinois Supreme Court subsequently denied Downey & Rippe and the Debtor's petition for leave to appeal.

21. When the case was remanded to the trial court, Mrs. Downey filed a motion asking State Court Judge, in accordance with the Appellate Court decision, to decide the claims against the Debtor. Mrs. Downey stressed that the parties, the witnesses, and the trial court had already devoted considerable time, energies, and resources trying the claims against the Debtor without there having been an adjudication of the Debtor's liability. When the jury returned its verdict in favor of Downey & Rippe, Mrs. Downey had rested her case on the equitable claims against the Debtor that were being tried before the State Court Judge, and the Debtor was substantially finished submitting its evidence. Rather than conduct an entirely new trial, Mrs. Downey urged the State Court Judge to issue a ruling on the alter ego claims against the Debtor based on the evidence that was submitted at the first trial.

22. The State Court Judge agreed. At a presentment hearing on March 17, 2022, after entertaining argument from the parties on their respective proposals for how the case should proceed, the State Court Judge concluded that he was ready and prepared "to decide all of the issues as to Trinity," including whether "whether Trinity was the alter ego" and "whether Trinity

5

breached" the loan agreements at issue. (*See* 3/17/2022 Transcript, 27:15-29:16, attached hereto as Exhibit C.) As the State Court Judge explained, this course of action was "the only thing that makes sense" in light of the Appellate Court's opinion and "I am going to following this decision [of the Appellate Court]." *Id.* The State Court Judge added that "I don't need briefs on anything," (*Id.*, p. 15:1-15:15), stressing that he had a vivid recollection of the evidence at trial:

> "I could rule right this moment. This case, it's burned into my memory. It is – I got it. I remember everything everybody said. And nobody needs to refresh my recollection. Nobody needs to tell me what the law is. I know it. I know it. I know it."

(*Id.*, at 31:11-31:17.)

23. The parties returned for a subsequent hearing on March 24, 2022, during which the State Court Judge reiterated that "I would like to rule right now." (*See* 3/24/2022 Transcript, 4:1, attached hereto as **Exhibit D.**)

24. However, on the eve of the March 24, 2022 hearing date, the Debtor—without prior notice or warning—filed for bankruptcy.[2]

25. As a result of the automatic stay triggered by the Debtor's bankruptcy filing, Mrs. Downey's claim against the Debtor remains unliquidated.

26. Accordingly, Mrs. Downey brings this motion to seek relief from the automatic stay for the limited purpose of allowing Mrs. Downey to liquidate her claim against the Debtor in

---

[2] The timing of the Debtor's bankruptcy petition, as well as indications that the Debtor was neither insolvent nor in any immediate financial duress, raise serious questions about whether the Debtor filed this proceeding in bad faith as a litigation tactic intended to thwart Mrs. Downey from obtaining a judgment in the DuPage Action. *See* 11 U.S.C. § 1112(b) (authorizing the dismissal of a chapter 11 case "for cause"). Courts will dismiss chapter 11 proceedings that constitute an improper litigation tactic designed to thwart litigation against a debtor. *See, e.g.*, *Dowd & Dowd Ltd. v. Gleason*, 2001 Bankr. LEXIS 1647, *7 (Bankr. N.D. Ill. 2001) (among the considerations bearing on "whether a bankruptcy petition was filed in bad faith [are] … whether the debtor filed the Chapter 11 petition as a tactic to obtain a litigation advantage….").

6

the State Court Action. Enforcement of any judgment entered against the Debtor would remain stayed subject to further order of this Court.

## ARGUMENT

27. The Debtor's bankruptcy filing is an eleventh-hour attempt to thwart Mrs. Downey's years-long effort to obtain an adjudication in the State Court Action of the Debtor's liability for monies that were indisputably received from Mr. and Mrs. Downey.

28. As the Seventh Circuit has recognized, "though § 362(a) provides for a nearly comprehensive stay of proceedings against the debtor, § 362(d) requires the bankruptcy judge "to grant relief from the stay . . . for cause." *In re Fernstrom Storage & Van Co.*, 938 F.2d 731, 735 (7th Cir. 1991). "'Cause' as used in § 362(d) 'has no clear definition and is determined on a case-by-case basis[,]'" however, "a number of themes emerge from the cases interpreting § 362(d)'s expansive language." *Id.* (quoting *In re Tucson Estates,* 912 F.2d 1162, 1166 (9th Cir. 1990)).

29. The Seventh Circuit embraces a "a three factor test" for determining whether cause exists. *Id.* The *Fernstrom* test asks whether: "(1) Any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit, (b) the hardship to the [non-bankrupt party] by maintenance of the stay considerably outweighs the hardship of the debtor, and (c) the creditor has a probability of prevailing on the merits." *Id.*

30. As set forth below, each of the *Fernstrom* factors favors allowing the State Court Judge to rule on the pending claims against the Debtor in order to liquidate those claims for purposes of this bankruptcy proceeding.

7

### A.     Debtor Will Suffer No Great Prejudice From the Continuation of the Suit

31. First, the Debtor will not suffer any great prejudice—or, for that matter, any prejudice at all—if the State Court Judge is allowed to issue a ruling regarding the Debtor's liability in the State Court Action.

32. The State Court Judge has made clear that the claims against the Debtor are fit for decision and he is ready to rule. If the State Court Judge adopts Mrs. Downey's proposal for using evidence from the first trial, the Debtor will not have to undergo a new trial or incur significant defense costs litigating these issues because the claims are already primed for decision. There is nothing left to do except allow the State Court Judge to rule. The parties are currently scheduled to appear in the State Court Action on April 8, 2022.

33. Should the State Court Judge conclude that the Debtor is liable to Mrs. Downey, proceedings to enforce that judgment would remain stayed pending further order of this Court. Thus, the Debtor will be entirely unprejudiced by allowing the State Court Judge to rule. In sharp contrast, it would be a colossal waste of resources for both the Parties and this Court to have to relitigate all of the matters that have arisen in the State Court Action again in this Court.

34. Accordingly, the first *Fernstrom* factor favors Mrs. Downey.

### B.     Maintaining the Stay Would Impose an Undue Hardship on Mrs. Downey

35. While the Debtor would not be harmed by allowing Mrs. Downey's claim to be liquidated in the State Court Action, Mrs. Downey would be severely prejudiced by maintaining the automatic stay.

36. Mrs. Downey is 93 years old. After litigating the State Court Action all the way to the Illinois Supreme Court, she is on the cusp of receiving a ruling on her claim against the

Debtor. The Debtor's last-minute bankruptcy filing threatens to derail this process and deprive Mrs. Downey of the ruling to which the Illinois Appellate Court held she is entitled.

37. Having presided over the trial, the State Court Judge is intimately familiar with the evidence submitted against the Debtor in the State Court Action, and it is only appropriate that he be the one to adjudicate those claims.

38. With Mrs. Downey having invested six years and hundreds of thousands of dollars in attorneys' fees pursuing her claims against the Debtor in the State Court Action, it would impose an enormous hardship on Mrs. Downey to deny her the opportunity to have her claim liquidated in the State Court Action and to force her to start over from square one in this bankruptcy proceeding.

39. Accordingly, the second *Fernstrom* factor strongly favors Mrs. Downey as well.

C.     **Mrs. Downey Has a Probability of Prevailing on the Merits**

40. The third and final factor in the *Fernstrom* analysis—whether the creditor has a probability of prevailing on its claim against the debtor—is a burden that is "very slight." *In re D/C Distribution, LLC*, 617 B.R. 600, 615 (Bankr. N.D. Ill. 2020). According to the Seventh Circuit, this factor will be deemed satisfied if the contemplated action is "not frivolous." *Fernstrom*, 938 F.2d at 736.

41. Uncontroverted evidence at trial revealed that the Debtor was founded and funded with monies lent by Mr. and Mrs. Downey, and that its primary asset—patent rights pertaining to its mattress product—was likewise developed with those monies.

42. Despite the formation of the Debtor as a separate corporation, the Debtor and Downey & Rippe essentially functioned as a single entity. They conducted business out of the same office, had the same telephone number, and used the same computers and phone system.

They used the same registered agent, the same accountant, and kept their inventory warehoused at the same location. Downey & Rippe and the Debtor also had the same principals and the same employees. At any given moment, an employee would perform services for whichever company needed assistance. The Debtor did not pay the salaries of its employees or make distributions to its members. All compensation was paid by Downey & Rippe.

43. Downey & Rippe paid all of the Debtor's expenses with the money loaned to it by Mr. and Mrs. Downey. According to Bruce Rippe, Downey & Rippe essentially functioned as a "pass-through" entity for the money that went to the Debtor. The Debtor did not even have its own bank account. When the Debtor incurred expenses, Mary Ellen Rippe would present those expenses to Bernie (and after he died, Mrs. Downey), and Bernie or Mrs. Downey would then pay the expenses by loaning the necessary funds to Downey & Rippe.

44. The Debtor also failed to observe basic corporate formalities. During the entire time that Mr. and Mrs. Downey provided financing to the companies, the Debtor never had an operating agreement, a member agreement, or held any board meetings. According to Joe Downey, the Debtor was never intended to be a separate company from Downey & Rippe. In Joe's words, they were "just two pockets on the same pair of pants."

45. Mrs. Downey's claims against the Debtor are anything but frivolous. Indeed, it appears that the Debtor filed for bankruptcy solely because it anticipates an adverse ruling in the State Court Action and wishes to avoid that prospect at all cost.

46. Accordingly, the third *Fernstrom* factor strongly favors Mrs. Downey.

WHEREFORE, because all three *Fernstrom* factors favor lifting the automatic stay, Plaintiff Jean-Ann Downey, as Trustee of the Jean Ann Downey Trust dated 8/15/1990, respectfully requests that this Court grant Mrs. Downey relief from the stay and authorize the

10

court in the State Court Action to liquidate Mrs. Downey's pending claims against the Debtor, Trinity Guardion, LLC.

Dated:  March 30, 2022    Respectfully submitted,

JEAN ANN DOWNEY, as Trustee of the JEAN ANN DOWNEY TRUST dated 8/15/1990

By: */s/ Andrew G. May*
     One of Her Attorneys

Andrew G. May (*pro hac vice* pending)
Thomas Wolford (*pro hac vice* forthcoming)
Steven F. Pflaum (*pro hac vice* forthcoming)
NEAL, GERBER & EISENBERG LLP
Two N. LaSalle Street, Suite 1700
Chicago, IL 60602
(312) 269-8000
spflaum@nge.com
twolford@nge.com
amay@nge.com

## CERTIFICATE OF SERVICE

I, Andrew G. May, an attorney, hereby certify that on March 30, 2022, a true and correct copy of the foregoing motion was electronically filed with the Clerk of the Court using the CM/ECF filing system, which will send electronic notification to all counsel of record.

>*/s/ Andrew G. May*
>Andrew G. May

33500983.4